

FILED

07 JAN 31 PM 3:18

CLERK, U.S. BANKRUPTCY COURT
EASTERN DIST. OF CA.
SACRAMENTO, CA.

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

In re:

MICHAEL HAT, dba MICHAEL HAT FARMING COMPANY,

Debtor(s).

Case No. 04-32497-B-11

POSTED ON WEB SITE

JOHN VAN CUREN, TRUSTEE,

Plaintiff,

vs.

GREAT AMERICAN INSURANCE COMPANY and MICHAEL HAT,

Defendant(s).

AND RELATED COUNTERCLAIM

A.P. No. 04-2481-B

Submitted September 29, 2006

**MEMORANDUM DECISION**

Plaintiff John Van Curen, chapter 11 trustee of the estate of Michael Hat, ("Trustee") seeks a judicial determination that certain crop insurance policies[1] and the proceeds therefrom are

[1] Six federally insured Multiple Peril Crop Insurance Policies issued by Great American Insurance Company ("GAIC") in January 2003, policy numbers 2003-CA-030-914373, 2003-CA-030-914428, 2003-CA-030-914435, 2003-CA-030-914436, 2003-CA-030-914438 and 2003-CA-030-914439 (collectively, the "Subject Policies").

262

property of the bankruptcy estate pursuant to 11 U.S.C. § 541[2] and that any proceeds payable under the Subject Policies be turned over to the estate.[3] Defendant GAIC filed a counterclaim interpleading funds which ultimately totaled $761,329.00 (the "Counterclaim"). For the reasons set forth in this Memorandum Decision, the court holds (1) Trustee is entitled to a judgment on the complaint declaring that the Subject Policies are property of the bankruptcy estate; (2) that Trustee, as counter-defendant, shall take nothing on the Counterclaim; (3) that defendant and counter-defendant Michael Hat ("Hat") shall take nothing on the complaint or the Counterclaim; and (4) that Trustee, in his capacities as Counterclaimant and interpleading plaintiff, is entitled to judgment on the Counterclaim in the amount of $761,329.00.[4]

The court held a trial in Sacramento California on June 14, 15, and 28, 2006. The trial continued to July 25, and August 22, 2006 for the court to consider a post-trial motion. Appearances were noted on the record. At the conclusion of the trial, the

---

[2] Unless otherwise noted, all statutory references are to the Bankruptcy Code, 11 U.S.C. §101 *et seq.*, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure.

[3] The complaint contains a third cause of action for Breach of Contract but, as is set forth in detail below, the third cause of action was dismissed pursuant to a settlement agreement between Plaintiff and GAIC.

[4] Trustee and GAIC have entered into a settlement agreement whereby the trustee shall received 80% of any judgment on the counterclaim with GAIC itself receiving the remaining 20%. Thus, of the amount set forth above, $761,329.00, Trustee shall receive $609,063.20 and GAIC shall receive $152,265.80.

court established a briefing schedule for post-trial briefs which also constituted closing argument. At the conclusion of the briefing schedule on September 29, 2006, the matter was taken under advisement.

This is a core proceeding and the court has jurisdiction over this matter. 28 U.S.C. §§ 1334 and 157. Venue is proper in this court under 28 U.S.C. § 1409. There is no dispute concerning jurisdiction or venue.

The following constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

**FACTS**

On January 20, 2006, the parties filed a Stipulation Regarding Undisputed Material Facts and Documents (Dkt. No. 129). The facts alleged in the Stipulation are fully incorporated herein.

On July 20, 2001 (the "Petition Date"), Hat commenced the above-captioned voluntary Chapter 11 case. Hat acted as debtor in possession until April 11, 2003, when Trustee was appointed. Prior to the Petition Date, Hat and two related companies conducted an agricultural enterprise in the Central Valley of California. Grapeco, Inc., one of the related companies, filed its own chapter 11 petition on the Petition Date in the above-referenced Bankruptcy Court, commencing case no. 01-92889-A-7 (now designated case no. 04-32498-B-7). Capello, Inc., the other related company, also filed a chapter 11 petition on the Petition

Date in said Bankruptcy Court, commencing case no. 01-92890-A-7
(now designated case no. 04-32499-B-7).  The bankruptcy cases of
Grapeco, Inc. and Capello, Inc. have since been converted to
chapter 7 of the Bankruptcy Code, and chapter 7 trustees have
been appointed.

As of the Petition Date, the property of the Hat bankruptcy
estate (the "Estate") included, among other assets, the following
real properties: (i) ownership of a ranch and vineyard located at
28391 Peterson Road, Wasco, California 93280 (Kern County),
commonly known as the Pond Ranch ("Pond Ranch"); (ii) ownership
of a ranch and vineyard consisting of approximately 2,146 acres
of land in Monterey County, California and commonly known as the
Coastal Vineyard ("Coastal Vineyard"); and (iii) ownership of
approximately 2,159 acres of real property in Madera County,
California known as the Rampage Ranch ("Rampage Ranch").

Pond Ranch, Coastal Vineyard and Rampage Ranch remained
property of the Estate at all times from the Petition Date until
July 1, 2003, when each was abandoned by Trustee pursuant to his
motion (Main Case Dkt. No. 1643)(the "Abandonment Motion") and
entry of the Bankruptcy Court's Order Approving Trustee's
Abandonment Of Estate Property (Main Case Dkt. No. 1789)(the
"Abandonment Order").[5]  The Abandonment Motion identified for

---

[5] The court notes that the parties throughout this
proceeding have consistently referenced June 30, 2003 as the date
on which Trustee abandoned the real properties at issue here.  A
review of the court's docket indicates that the clerk entered the
Abandonment Order on the docket July 1, 2003.  It became
effective on that date.  Sewell v. MGF Funding, Inc. (In re
Sewell), 345 B.R. 174, 180 (9th Cir. BAP 2006).

abandonment Pond Ranch, Coastal Vineyard, Rampage Ranch and certain vehicles. The Abandonment Order authorized abandonment of the foregoing assets identified in the Abandonment Motion. Neither the Abandonment Motion nor the Abandonment Order made any reference to any of the Subject Policies.

As of the Petition Date, the property of the Estate also included the following real properties: (i) approximately 600 acres of land located in Kern County, California, and known as the Arvin Ranch (the "Arvin Ranch"); (ii) an approximate 30,000 square foot residence and 184 acres of land and vineyards, together with other improvements, located on Sedan Avenue in Manteca, California, San Joaquin County (the "Sedan Property"); (iii) a juice concentrate facility and surrounding real property located in Madera, California, Madera County (the "Grapeco Facility"); (iv) approximately 400 acres of land located in Merced County, California, and known as the Grissom Ranch (the "Grissom Ranch"); and (v) a disputed amount of acreage located in San Joaquin County, California, in which the Estate owned partial interests as a matter of public record (the "Partial Interests").

The Arvin Ranch was sold by Trustee, with the approval of the Bankruptcy Court, as of October 15, 2003; the Sedan Property was sold by Trustee, with the approval of the Bankruptcy Court, as of April 28, 2004; the Grapeco Facility was sold by Trustee, with the approval of the Bankruptcy Court, as of December 30, 2003; the Grissom Ranch was sold by Trustee, with the approval of

the Bankruptcy Court, as of October 7, 2003; and the Partial Interests have not been sold or otherwise disposed of to date.

Thus, as of the time of Trustee's appointment as the trustee in April 2003, each property described in the preceding paragraphs remained within the Estate. From the Petition Date until April 2003, Hat did not acquire any additional real property. Hat held no insurance policies with GAIC as of the commencement of his bankruptcy case.

From the Petition Date to April 2003, Hat obtained court authority to use cash collateral of creditor Bank of the West to pay certain expenses of the Estate. Following the harvest of the 2002 crop, Bank of the West refused to authorize the use of its cash collateral for cultivation of a 2003 crop. Bank of the West allowed Hat to use cash collateral only to the extent necessary to pay essential expenses and services. On April 4, 2003, Hat's authorization to use cash collateral terminated. Trustee did not seek authorization to use cash collateral at any time following his appointment.

Crop insurance is a form of insurance purchased by some farming individuals and businesses in order to protect themselves against the risk of loss of either quality or quantity of crops grown by them. Crop insurance policies are issued by insurance companies such as GAIC, and are reinsured by the Federal Crop Insurance Corporation (the "FCIC"), a federal agency established pursuant to the Federal Crop Insurance Act, 7 U.S.C. §1501 *et seq.* Generally, crop insurance policies are issued in two

alternative forms: One for catastrophic coverage only, known as a "CAT policy." The other form of crop insurance, a "buy-up policy," is for broader or additional coverage. The terms of crop insurance policies are a matter of federal law and the basic rules governing the Subject Policies are set forth in a publication called the 2001 MPCI Basic Provisions (the "MPCI Basic").

An insured party has a "share" in a crop to the extent of its percentage of interest as owner, operator or tenant at the time that the insurance attaches. For purposes of determining an indemnity claim, a "share" is limited to the insured party's interest in the crop at the earlier of the time of loss or the beginning of harvest. In the case of crop insurance for grapes in California, but not necessarily limited to California, special applicable provisions are set forth in a document entitled the Grape Crop Provisions (the "Grape Provisions"). Insurance coverage for grape crops in California begins on February 1 of the covered calendar year (Grape Provisions, Sec. 9(a)(1)). Premiums owing under grape crop insurance policies in California are due on October 1 of the covered calendar year.

Hat customarily considered insuring the crops that he was farming against loss resulting from the destruction of or damage thereto. If prudent and available, Hat would obtain such insurance. As early as 1999, before the commencement of the Bankruptcy Case, Hat purchased crop insurance from American Agrisurance, Inc., also known as American Ag ("AmAg") for certain

grape crops.  In 2001, prior to the commencement of his chapter
11 case, Hat purchased CAT crop insurance policies from AmAg, for
the grape crops grown on property which he owned.  Hat purchased
those policies (collectively, the "2001 Policies") with the
assistance of representatives of Barlocker Insurance Agency,
Inc., an insurance agency firm (the "Barlocker Firm"), through
applications signed by Hat.

     In 2002, after the commencement of his chapter 11 case, Hat
again purchased crop insurance policies from AmAg, this time
buying more enhanced coverage, through buy-up policies.  Those
policies (collectively, the "2002 Policies") were again obtained
through the Barlocker Firm, through applications signed by Hat
and dated January 31, 2002.  The applications were not completed
by Hat.  Instead, AmAg completed the majority of the application
using information from the prior year in its files.  Information
on the form provided by AmAg included: the applicant's name,
applicant's marital status, whether applicant was an individual
or some other entity, applicant's social security number or
employer identification number, the type of crop, and where the
crop was located.  At all times during this bankruptcy case, crop
insurance policies with AmAg carried Hat's social security number
and not the employer identification number for Michael Hat
Farming Company.  Once the application was received, the
applicant chose the type of coverage sought, corrected any
errors, signed and dated the application, and returned it to the
Barlocker Firm.

In late 2002, while still a debtor-in-possession, Hat made
claims for indemnity for crop losses under the 2002 Policies.
AmAg approved the claims and paid to Hat, in the form of checks
or vouchers, an amount in excess of $8,000,000.  Of those checks,
Hat deposited the first checks, in an aggregate, approximate
amount in excess of $1,000,000, into debtor-in-possession
accounts, and turned the other checks over to his counsel without
deposit, marking each "VOID."  Apparently, a dispute arose with
respect to those indemnity claims and payments made under the
2002 Policies, and in order to address the dispute, Hat retained
the law firm of Askew & Archbold (the "Askew Firm") as special
counsel to provide advice, with the approval of the Court.  In
his application to employ the Askew Firm, Hat (who verified the
application under penalty of perjury) sought the ability to
retain the firm as debtor-in-possession, and stated that Hat's
retention of the Askew Firm "would be in the best interests of
the Chapter 11 estate."  By its order entered on March 25, 2003,
the Court authorized Hat, as debtor-in-possession, to retain the
Askew Firm under the provisions of Section 327 of the Bankruptcy
Code.  After the Askew Firm completed its services, it applied
for payment of its compensation by the Estate, and its
application was approved for fees and costs, in an aggregate
amount of $6,863.06 on July 16, 2004.  All expenses of the 2002
crops insured under the 2002 Policies were paid from funds of the
Estate, out of debtor-in-possession bank accounts.

After the 2002 crop year, AmAg exited the business of writing crop insurance policies. Hat was transferred to GAIC by the Barlocker Firm. Like the applications for the 2001 Policies and 2002 Policies with AmAg, the applications giving rise to the Subject Policies were not prepared by Hat. The applications were prepared by Melinda Sue Leathers of the Barlocker Firm with the assistance of an employee at GAIC: Aaron Schlevkoff. The information on the application forms was taken from Hat's previous application with AmAg. The applications for the Subject Policies were signed by Hat on or about January 27, 2003. At that time, Hat was still acting as debtor-in-possession, and each of the properties identified in the applications was property of the Estate. The applications for the Subject Policies identified Hat's personal social security number, rather than the Estate's postpetition tax identification number. That information was part of the information which Ms. Leathers entered on the applications. After processing the above-referenced applications, GAIC issued the Subject Policies.

Around the time of his appointment on April 11, 2003, Trustee toured the various properties with Hat. On or about April 9, 2003, the parties toured the ranches in the San Joaquin Valley. Approximately two days later on April 11, 2003, the parties toured Coastal Vineyard. A third trip occurred on or about June 18, 2003, when Trustee and Hat toured the properties located in and around Manteca California. During one or more of these trips, Hat informed Trustee that he had purchased crop

insurance on all of the grape ranches.  During the third meeting on June 18, 2003, Hat stated that he believed that the premiums on the crop insurance were the responsibility of the Estate.  Hat reiterated this position in a telephone conversation with Trustee in late July, 2003.

On May 15, 2003, Trustee filed a Statement of Trustee's Investigation and Report with the Court.  With respect to Rampage Ranch, Pond Ranch and Coastal Vineyard, Trustee concluded:  "No one is willing to allow the use of funds which may be available to the Trustee or to advance additional funds for the farming of the [properties], even to protect the value of the grapevines, if any value exists."  Given the lack of funds, Trustee stated that he would not farm the properties in 2003 and intended to seek court approval of their abandonment.  Trustee made no mention of the Subject Policies therein.

At some point during May, 2003, Trustee gave Hat oral permission to enter onto the properties that Trustee intended to abandon so that Hat could tend to the vines.  Hat and Ralph Pistoresi ("Pistoresi") began farming Rampage Ranch and Pond Ranch at or around this time.  Hat and Pistoresi entered into a farm management agreement.  Under the terms of that agreement, Pistoresi would receive most if not all of any recovery by Hat in this adversary proceeding.  Permission for Hat to enter the two properties was confirmed in a letter from Trustee to Hat dated May 26, 2003.  Trustee's permission was conditioned on Hat

indemnifying the estate against liability and specifically prohibited Pistoresi from entering the property.

On May 20, 2003, Trustee filed the Abandonment Motion. Trustee represented therein that there were no operating funds available to Trustee to farm the vineyards located on Pond Ranch, Rampage Ranch and Coastal Vineyard, and that the properties were either burdensome to or of inconsequential value and benefit of the Estate. As set forth above, Pond Ranch, Rampage Ranch and Coastal Vineyard were abandoned to Hat pursuant to the Abandonment Order. The Subject Policies were not listed among the assets abandoned. It is undisputed by the parties that the 2003 grape crop was in existence, i.e. bud break had occurred, at the time of abandonment. Trustee did not expressly reserve any right to the crops on the abandoned real property.

At some point before August 9, 2003, Hat provided Trustee with a list of the Subject Policies. Trustee included this list, which proved to be incomplete as it omitted one policy, as an enclosure to Trustee's August 9, 2003 letter to Barlocker. That letter informed Barlocker that "no one other than [Trustee] has any authority to make any decision or to provide any direction with regard to the 2003 crop insurance."

In August 2003, Hat informed Barlocker of potential losses under the Subject Policies. Hat did so based on information provided to him by Pistoresi. An employee of Pistoresi had noticed sunburn on grapes on Rampage Ranch in late July 2003 and had informed Pistoresi of it at that time. After the second such

report within a week, Pistoresi examined the Rampage Ranch himself and thereafter informed Hat of the potential sunburn damage to the grapes. In response, Notice of Loss forms indicating "probable loss" under the Subject Policies were prepared. Hat signed each such Notice of Loss.

At some point during the first week of October, 2003, Hat contracted with Sarkis V. Sarabian and Associates ("Sarabian") to document any damage to the grape crop. Sarabian conducted inspections on or about October 10, 2003. On or about November 20, 2003, Sarabian issued a report to Hat concluding that the grape crop suffered from heat damage. It expressed no opinion of when the heat damage occurred.

On October 1, 2003, Trustee advised Barlocker Insurance Services and GAIC in a letter that he would be asserting an interest in "all rights under the 2003 crop insurance policies issued to the Hat Entities, including rights to payments on allowed claims." On December 30, 2003, GAIC advised Hat that Trustee claimed an exclusive interest in the proceeds of the Subject Policies, and that, unless Hat's interest was demonstrated to be correct, GAIC would work with Trustee during the claims adjustment process.

In correspondence dated January 5, 2004, Hat advised GAIC that he was aware of no legal authority to support Trustee's declaration of interest in the Subject Policies or proceeds thereof and set forth the alleged legal basis of his claim of interest therein. On January 11, 2004, GAIC advised Trustee that

GAIC had determined that Trustee "may not have any enforceable right to insurance proceeds, regardless of the ongoing dispute as to the scope of Trustee's prior abandonment of certain estate assets." Nevertheless, GAIC invited Trustee to identify any legal authority that would require a different conclusion.

On January 20, 2004, GAIC filed a request for payment of administrative expenses (the "GAIC Request") pursuant to Section 503(a) of the Bankruptcy Code, requesting that Trustee, on behalf of the Estate, pay premiums and interest thereon owing under the Subject Policies. Trustee opposed GAIC's application for payment of the premiums as an administrative expense. In Trustee's opposition to GAIC's application, Trustee acknowledged that Pond Ranch, Rampage Ranch, and Coastal Vineyard had been "eliminated" from the Estate. Trustee acknowledged that, with the exception of the Sedan Property, the Estate did not "fully and continuously farm" any of the vineyards covered by the Subject Policies through the harvest. Trustee contended that GAIC and Hat had not cooperated with Trustee's request for documents concerning the Subject Policies, and sought denial of the application on the grounds that he lacked "sufficient information with which to respond fully to [GAIC's] request." The Court converted GAIC's request for payment into an adversary proceeding.

Following GAIC's initial adjustment of Hat's claims under the Policies, GAIC determined that the indemnity payments on the Subject Policies would exceed the premiums due thereon. In accordance with 7 CFR § 457.8 ¶1, GAIC deducted the premium

amounts due from the indemnities. GAIC then withdrew its application for payment of the premiums as an administrative expense of the Estate.

Following GAIC's claims adjustment process, GAIC determined that no indemnity was due under the following policies: (a) Policy No. 2003-CA-030-914373, (b) Policy No. 2003-CA-030-914435, (c) Policy No. 2003-CA-030-914438, and (d) Policy No. 2003-CA-030-914439. Ultimately, GAIC determined that the sum of $761,329.00 was owed under the Subject Policies, net of premium liabilities, based on losses of the covered 2003 grape crops for Rampage Ranch and Coastal Vineyard.

Although Trustee objected to GAIC's application seeking payment of the premiums due GAIC on the Subject Policies by the Estate as an administrative expense, Trustee continued to assert an interest in the Subject Policies and advised GAIC that GAIC could make no payments pending Trustee's evaluation of the Estate's interest therein. On October 14, 2004, Trustee advised GAIC that Trustee's claim of interest in the proceeds of the Subject Policies was based on Trustee's contention that Hat acquired the Subject Policies on behalf of the Estate, rather than on his personal behalf, and that the Subject Policies had not been abandoned to Hat. On the same day, Trustee commenced the within adversary proceeding against GAIC and Hat regarding the Subject Policies and proceeds, seeking a determination that the Subject Policies and proceeds thereon are property of the Estate, turnover of proceeds, and interest thereon.

As was briefly noted above, during the course of the litigation, Trustee settled his claims against GAIC. Court approval of the settlement was not required under the terms of the confirmed chapter 11 plan. However, Trustee did move on May 9, 2006 to dismiss GAIC as a defendant to the complaint and to discharge GAIC as stakeholder. In light of the totality of the settlement agreement, at the initial hearing on June 6, 2006, the court construed the latter request instead as a motion to substitute Trustee for GAIC as interpleading plaintiff. The court requested further briefing on the motion as so construed. At the final hearing held June 12, 2006, the court granted the motion, dismissed GAIC as a defendant and substituted Trustee as interpleading plaintiff pursuant to the terms of the settlement.

**Analysis**

Trustee's complaint contains three causes of action: (1) a request for declaratory relief that the Subject Policies and any indemnity owing thereunder are property of the bankruptcy estate; (2) a request that defendants GAIC and Hat turnover to the Bankruptcy Court any portion of the indemnity owing under the Subject Policies that is in each defendant's possession; and (3) a cause of action for breach of contract against GAIC only. According to their post-trial briefs, Trustee and Hat both agree that the second cause of action is moot. GAIC interpled the indemnity found owing under the Subject Policies and that amount ($761,329.00) is currently in the court's Registry. Hat argues

that the third cause of action was effectively dismissed when GAIC was dismissed from this proceeding by order entered June 13, 2006. The court agrees. The third cause of action sought damages solely against GAIC. Because that defendant has been dismissed, the third cause of action is moot.

**First Cause of Action:**
**Ownership of the Subject Policies**

The court's pre-trial order entered May 22, 2006, sets forth two issues for which proof at trial is required: "(i) Whether the Policies and any and all proceeds arising thereunder, including the Indemnity Payment, are property of the Debtor's estate herein (the "Estate). (ii) Whether the Policies were acquired by the Debtor, while he was in possession of the Estate, for or on behalf of the Estate." (Pre-Trial Order, Dkt. No. 165, p. 3). These two issues are inextricably intertwined. Trustee must prevail on the latter in order to prevail on the former. The issues will be discussed together.

11 U.S.C. § 541 states in relevant part:

> (a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
>
> (1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.
>
> (2) All interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is -
> (A) under the sole, equal, or joint management and control of the debtor; or

(B) liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable.

(3) Any interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title.

(4) any interest in property preserved for the benefit of or order transferred to the estate under Section 510(c) or 551 of this title.

(5) Any interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the petition, and that the debtor acquires or becomes entitled to acquire within 180 days after such date -

(A) by bequest, devise, or inheritance;

(B) as a result of a property settlement agreement with the debtor's spouse, or of an interlocutory or final divorce decree; or

(C) as a beneficiary of a life insurance policy or of a death benefit plan.

(6) Proceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.

(7) Any interest in property that the estate acquires after the commencement of the case.

(West 2005).

The only subpart of Section 541(a) that arguably applies to the Subject Policies themselves is 11 U.S.C. § 541(a)(7). Subparts (a)(1) and (a)(2) are inapplicable because it is undisputed that the Subject Policies did not exist on the petition date. Subpart (a)(3) does not apply because this adversary proceeding does not involve recovered property. Subpart (a)(4) does not apply because this adversary proceeding does not involve equitable subordination or the preservation of

rights under Section 551. Subpart (a)(5) does not apply because the Subject Policies were not obtained by any of the methods described therein. Subpart (a)(6) does not apply to the Subject Policies themselves as the policies are not profits, proceeds, rents, etc. It would however, apply to any indemnity due under the Subject Policies if those policies were themselves found to be property of the estate. The court therefore defers discussion of this issue until later in this Memorandum Decision.

The principal focus is on 11 U.S.C. § 541(a)(7). "[Section 541(a)] defines what interests of the debtor are transferred to the estate. It does not address the threshold questions of the existence and scope of the debtor's interest in a given asset. Under both the Act and the Code, we resolve these questions by reference to nonbankruptcy law." State of California v. Farmers Markets, Inc. (In re Farmers Markets, Inc.), 792 F.2d 1400, 1402 (9th Cir. 1986). *See also* Butner v. United States, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Under most circumstances, the applicable non-bankruptcy law is State law. However, here it is a combination of State and Federal Law. The assets at issue here are federally reinsured Multiple Peril Crop Insurance policies. Federal law defines and governs the policy terms and payment of claims. See 7 U.S.C. § 1501, *et seq.* and 7 C.F.R. Parts 400 & 457 (2003). The statutes specifically preempt state law, but only to the extent that the contracts, agreements or regulations so provide or to the extent that state law conflicts

with any contracts, agreements, or regulations issued. 7 U.S.C. § 1506(l).

The Department of Agriculture has promulgated extensive regulations to implement the Federal Crop Insurance Act. One such regulation is found at 7 C.F.R. § 457.8 (2003). It contains an extensive series of provisions incorporated in every Federal Crop Insurance policy issued. One such provision is the definition of "insured."

> Insured. The named person as shown on the application accepted by us. This term does not extend to any other person having a share or interest in the crop (for example, a partnership, landlord, or any other person) unless specifically indicated on the accepted application.

Id.

In most if not all situations, this would be the end of the analysis. However, here the court is faced with an ambiguity. The name of the debtor and the name of the bankruptcy estate are the same because this is an individual chapter 11 case. Both share the name Michael Hat. The definition of "insured" only refers to the "named person." It makes no mention of any other identifying characteristic. The applications themselves require the party applying to place either a social security number or an employer identification number. The court notes that the Regulation provides no explanation why an identifying number must be included. It only states that the number must be provided in the application for it to be complete and for the crop to be insured. See 7 C.F.R. § 457.8 (2003) [Terms and Conditions,

Basic Provisions, ¶ 2(b).] The social security number is not referenced in the definition of insured. The definition only refers to the party's name.

The court is unable to resolve the aforementioned ambiguity solely by reference to applicable Federal law. No party has identified a portion of the Federal Crop Insurance Act or the Regulations interpreting it that resolves this ambiguity, and the court is unaware of any such provision. The court must therefore look to state law to resolve the issue. At this point, the debtor's actions and intent when he applied for these policies become relevant.

It is undisputed that Hat was still serving as debtor-in-possession when he applied for the Subject Policies. It is also undisputed that Hat sought to insure crops that were at that time property of the bankruptcy estate. Finally, it is undisputed that despite this, the insurance applications were filled out using debtor's social security number and made no mention of the bankruptcy estate's tax identification number. Hat's testimony as to his intent has been conflicting throughout this proceeding. Hat's initial declaration filed with his motion for summary judgment (Dkt. No. 52) implies strongly in paragraph 10 that he acted intentionally in order to purchase the insurance policies for himself. Yet his deposition testimony (Trustee's Exhibit 21, p. 61) states that Hat never thought about the issue when he purchased the policies. However, Hat testified on June 15, 2006,

during the trial on this matter, that he "took out insurance to insure the crop ... as debtor-in-possession."

Hat's testimony that he purchased the crop insurance as debtor-in-possession is consistent with other evidence. Hat did not fill out the forms himself. It is undisputed that Melissa Leathers did. The crop insurance forms filled out for the two years prior to the year at issue were also prepared in Hat's name using his personal social security number. While Hat did not fill out these prior forms, neither did he correct the error as he was permitted to do. This evidence is relevant to show a pattern under Fed. R. Evid. 406. Proceeds from the prior two years of insurance were paid into the debtor-in-possession account. These funds were used pursuant to numerous cash collateral orders to fund the operation of Michael Hat Farming Company. Hat also obtained court approval to employ Askew and Archbold as special counsel for the chapter 11 estate. Askew and Archbold represented the estate in regards to AmAg's audit of the 2002 crop insurance policies. On more than one occasion, Hat stated that he believed that the estate was responsible for payment of the premiums on the Subject Policies. Hat's actions before this dispute arose are inconsistent with Hat's current position that he purchased the Subject Policies for himself.

Based on the foregoing, the court finds that Hat purchased the Subject Policies as debtor-in-possession; that he purchased them on behalf of the estate; that the estate is the "Insured" under the Subject Policies; and that they are therefore an

"interest in property that the estate acquire[d] after the commencement of the case." 11 U.S.C. § 541(a)(7) (West 2005).

**Abandonment of the Subject Policies**

The Subject Policies were property of the bankruptcy estate when acquired and remain so today. Paragraphs 28 and 29 of the MPCI Basic Provisions incorporated into each of the Subject Policies contain specific provisions governing the transfer of coverage and indemnity and the assignment of indemnity. The evidence presented at trial shows that no party sought transfer of the Subject Policies under the terms thereof.

Furthermore, there is no informal abandonment of property of the estate. Catalano v. C.I.R., 279 F.3d 682, 686 (9th Cir. 2002)("In short, [a]bandonment requires formal notice and a hearing.")(citations and internal quotes omitted). It is undisputed that the Subjects Policies were not among the assets listed in the Abandonment Motion or Abandonment Order. They therefore remain property of the bankruptcy estate.

**Indemnity is Also Property of the Estate**

Finally, because the Subject Policies are property of the estate, the "proceeds, product, offspring, rents, or profits of or from" the Subject Policies are also property of the estate. See 11 U.S.C. § 541(a)(6). In other words, to the extent that an indemnity is owing under the Subject Policies, that too is property of the estate. That issue will be addressed below.

Because of the foregoing, Trustee is entitled to a declaratory judgment that the Subject Policies are property of the Estate.

**Affirmative Defenses to the Complaint**

Both Hat and GAIC pled various affirmative defenses in their answers to Trustee's complaint. Certain affirmative defenses were deemed abandoned and have been addressed by the court's pre-trial order. The court will only address those that remain.

**GAIC**

The affirmative defenses pled by GAIC in its answer are moot. Trustee has settled his claims against GAIC.

**Hat**

In his answer, Hat pled eight affirmative defenses. The pre-trial order deemed the first affirmative defense to be abandoned pursuant to the terms of the court's Scheduling Order. The other seven of Hat's affirmative defenses remained following the pre-trial order. The court will address them in order.

A. Implied Acceptance of Conduct. Hat waived this affirmative defense in his post-trial brief.

B. Estoppel. The court finds that Hat has failed to satisfy the requirements for equitable estoppel. The elements of estoppel are:

> "(1) the party to be estopped must be apprised of the true facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury."

Cedars-Sinai Medical Center v. Shewry, 137 Cal.App.4th 964, 987, 41 Cal.Rptr.3d 48 (2006)(citations omitted). All elements must be present for application of this equitable doctrine. Hat has failed to satisfy his burden of proving either the second or third parts of the test. Trustee's actions regarding the Subject Policies have been largely consistent. At first blush, his opposition to GAIC's motion for an administrative claim could be construed as indicating a position that the Subject Policies are not the estate's responsibility. However, a more in-depth analysis shows that Trustee's initial opposition resulted largely from GAIC failing to provide the factual basis for its claim. In addition, Hat's protestations of a lack of knowledge that Trustee asserted ownership of the Subject Policies fails for lack of evidence. It is in fact contradicted by Hat's multiple assertions in 2003 that the estate was responsible for the premium payments. Because neither the second nor the third part of the test are satisfied, Hat cannot prevail on his request to estopp Trustee from asserting the Subject Policies are property of the estate.

C. Unclean Hands. The court finds that Hat has failed to satisfy the requirements for unclean hands. The bankruptcy court is a court of equity. "He who comes into Equity must come with

clean hands." Kendall-Jackson Winery, LTD v. Superior Court, 76 Cal.App.4th 970, 978, 90 Cal.Rptr.2d 743 (Cal.Ct.App. 1999) (citations omitted). "Not every wrongful act constitutes unclean hands. But, the misconduct need not be a crime or an actionable tort. Any conduct that violates conscience, or good faith, or other equitable standards of conduct is sufficient cause to invoke the doctrine." Id. at 979.

The court finds no conduct that would give rise to this defense. In his post-trial brief, Hat misstates the testimony Dennis Arnold. Mr. Arnold did not testify that Trustee was only interested in the Sedan Property. In fact, Mr. Arnold testified that he and Trustee discussed other properties as well. Trustee advised Mr. Arnold that the Coastal Vineyard "had gone to someone else." They also discussed Mr. Arnold's findings on alleged crop damage on the other properties. The court has addressed elsewhere the allegation regarding Trustee's opposition to GAIC's motion for an administrative claim. That discussion will not be repeated here. Furthermore, Trustee did not "sit back" while Hat perfected the claims. The evidence shows that Trustee made inquiries about making claims against the Subject Policies but was told that Hat had already filed the required claims. Trustee's failure to duplicate Hat's efforts is not evidence of unclean hands.

D. Waiver. The court finds that Hat has failed to satisfy the requirements for waiver.

> Waiver is the intentional relinquishment of a known right after knowledge of the facts. [Citations.] The burden ··· is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and "doubtful cases will be decided against a waiver [citation]. The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right. Waiver always rests upon intent.

Kacha v. Allstate Ins. Co., 140 Cal.App.4th 1023, 1033-34, 45 Cal.Rptr.3d 92, 99 (Cal.Ct.App. Sept. 20, 2006). There is no clear and convincing evidence of either an express or implied waiver. There is in fact no evidence at all of an intention by Trustee to relinquish his rights under the Subject Policies. There can therefore be no waiver.

E. Laches. The court finds no basis for laches under the facts of this case. Trustee consistently asserted an interest in the Subject Policies. There is no delay, let alone undue delay.

F. No Damages. Hat waived this affirmative defense in his post-trial brief.

G. Offset. Hat waived this affirmative defense in his post-trial brief.

**Counterclaim in Interpleader**

The court's pre-trial order set forth three issues related to the Counterclaim:

A. Whether Trustee or Hat or anyone at all is entitled to an indemnity payment under the policies.

B. Whether GAIC has performed any and all of its obligations under the policies by virtue of its interpleading of the Indemnity Payment.

C. Whether either Hat or Trustee is entitled to the proceeds and if not, whether the Court should return the interpled indemnity payment to GAIC....[6]

Both parties concede in their post-trial briefs that no evidence was presented by either side on the second issue. The court therefore holds that GAIC satisfied its obligations by interpleading the indemnity owing under the Subject policies. The first issue and the first portion of the third issue are substantially similar and will be addressed together.

**Is an Indemnity Owing Under the Subject Policies?**

For the reasons set forth above in the analysis of the First Cause of Action on the Complaint, the Estate, represented by Trustee, is the Insured on the Subject Policies. Because Trustee is the one and only insured, Hat cannot recover under the Subject Policies. Bonaparte v Allstate Ins. Co., 49 F.3d 486, 488 (9th Cir. 1995).

---

[6] The pre-trial order included language regarding Trustee's dispute as to the "presence or validity" of this issue. However, Trustee waived any objection to this issue and Hat failed to raise his objections to it in a timely manner.

Hat argues that he held a "share" in the crop insurance as the operator of the ranches.  That interpretation conflicts with the express provisions of the 2001 Multiple Peril Basic Provisions.  Paragraph 10(a) provides:

> (a) Insurance will attach only to the share of the person completing the application and will not extend to any other person having a share in the crop unless the application clearly states that:
>
> > (1) The insurance is requested for an entity such as a partnership or a joint venture;  or
> >
> > (2) You as landlord will insure your tenant's share, or you as tenant will insure your landlord's share.  In this event, you must provide evidence of the other party's approval (lease, power of attorney, etc.).  Such evidence will be retained by us.  You also must clearly set forth the percentage shares of each person on the acreage report.

7 C.F.R. § 457.8, ¶ 10(a) (2003).  The court previously determined that Hat filled out the application as debtor-in-possession on behalf of the Estate.  No other entity is specified in the applications.  Thus, Trustee, as current representative of the Estate, is the only insured.

Status as the Insured is only the first prerequisite for payment of an indemnity.  For Trustee to be entitled to the indemnity, he must establish that he held an insurable interest in the grape crop at two defined periods of time.  "An interest in property insured must exist when the insurance takes effect and when the loss occurs, but need not exist in the meantime." Cal. Ins. Code § 286 (West 2005).  "If the insured has no insurable interest, the contract is void." Cal. Ins. Code § 280 (West 2005).

**Insurable Interest on Effective Date of the Subject Policies**

It is undisputed that Rampage Ranch and Coastal Vineyard were property of the Estate when the Subject Policies took effect. Under the Grape Crop Provisions promulgated with the 2001 Multiple Peril Basic Provisions, crop insurance for grape crops began February 1, 2003 for the 2003 crop year. Grape Crop Provisions, § 9(a)(1). Neither ranch had been abandoned to Hat as of February 1, 2003. That did not occur until July 1, 2003, on entry of the Abandonment Order.

**Abandonment of Growing Crops**

As an initial matter, the court finds that the grape crops growing on Rampage Ranch and Coastal Vineyard were abandoned to Hat along with the real property. The parties all agree that the 2003 grape crop was in existence when the Abandonment Order was entered on July 1, 2003. Although the crops were not specifically listed in either the Abandonment Motion or the Abandonment Order, all parties agree that they were abandoned with the real property. Under California law, growing crops are considered fixtures on land. See Cal. Comm. Code § 9102.

> While for some purposes growing crops are considered personal property, it is practically elementary law that as between the vendor and vendee of real property having a growing crop thereon, such crop constitutes a part of the realty (unless there has been a constructive severance), and in the case of a voluntary conveyance of the land passes to the grantee unless specially reserved by the grantor.

Wilson v. White, 161 Cal. 453, 460, 119 P. 895 (Cal. 1911). No such express reservation occurred here. The 2003 crop was abandoned to Hat along with Rampage Ranch and Coastal Vineyard.

**Retroactive Effect of Abandonment**

Citing Catalano v. Commissioner of Internal Revenue, 279 F.3d 682 (9th Cir. 2002), Hat continues to argue that the June 30, 2003 abandonment of Rampage Ranch and Coastal Vineyard restored title to him *nunc pro tunc* providing him with the requisite insurable interest and stripping Trustee of the same. However, as this court noted in its November 15, 2005 ruling on Hat's motion for partial summary judgment, the *nunc pro tunc* effect of abandonment is subject to a balancing of the equities.

> The ordinary rule is that, when a trustee abandons property of the bankrupt, title reverts to the bankrupt, *nunc pro tunc*, so that he is treated as having owned it continuously. See Sparhawk v. Yerkes, 142 U.S. 1, 12 S.Ct. 104, 35 L.Ed. 915 (1891); Sessions v. Romadka, 145 U.S. 29, 12 S.Ct. 799, 36 L.Ed. 609 (1892); Brown v. O'Keefe, 300 U.S. 598, 57 S.Ct. 543, 81 L.Ed. 827 (1937). This is a fiction, and a fiction is but a convenient device, invented by courts to aid them in achieving a just result. It is not a categorical imperative, to be blindly followed to a result that is unjust. The Supreme Court itself had not so followed it. Dushane v. Beall, 161 U.S. 513, 16 S.Ct. 637, 40 L.Ed. 791 (1896); First National Bank of Jacksboro v. Lasater, 196 U.S. 115, 25 S.Ct. 206, 49 L.Ed. 408 (1905). See also In re J. C. Winship Co., 120 F. 93, 96 (7th Cir., 1903).

Wallace v. Lawrence Warehouse Co., 338 F.2d. 392, 394 n.1 (9th Cir. 1964). See also U.S. v. Grant, 971 F.2d 799, 804 (1st Cir. 1992) and Knapp v. Seligson (In re Ira Haupt & Co.), 398 F.2d 607, 613 (2nd Cir. 1968).

In this instance, the equities do favor such a result, and the court holds that abandonment of Rampage Ranch and Coastal Vineyard is effective *nunc pro tunc*. The evidence establishes that Trustee realized at or around the time of his appointment that he would not be farming the subject properties. Trustee lacked any funds with which to perform even basic farming tasks such as irrigation. Trustee gave Hat oral permission to enter onto the properties to perform necessary agricultural tasks in advance of abandonment; and Hat did so. Ultimately the properties were abandoned to Hat in the Abandonment Order. The only factor that appears to favor Trustee is that he is the only Insured. Because he is not the Insured, Hat cannot recover under the Subject Policies both as a matter of Federal and State law. Giving *nunc pro tunc* effect to the abandonment also strips Trustee of any possible insurable interest as of February 1, 2003; precluding his recovery as well. However, the fact that applying the ordinary rule on abandonment will eliminate Trustee's right to recover on the Subject Policies is insufficient to overcome the equities that favor Hat on this issue.

**Insurable Interest on Date of Loss**

Hat submitted Notice of Loss forms to Barlocker in August, 2003. In those forms, Hat indicated potential losses from rain damage in March and April 2003 and potential losses from heat damage in July, 2003. In the production worksheets prepared by

GAIC's insurance adjustor Dennis Arnold ("Arnold"), the losses were allocated as eighty percent (80%) to heat and twenty percent (20%) to rain.

**March and April 2003 Rain**

Twenty percent of the crop insurance losses at issue here were allocated by Arnold to damage from March and April 2003 rains. However, Arnold admitted at trial that this allocation was arbitrary. He stated that he is restricted by federal rule from either allocating a fifty-fifty loss or from setting the loss ratio for a potential cause at 0%.

No evidence, credible or otherwise, was presented at trial that the crops on Rampage Ranch or Coastal Vineyard were actually damaged by rain. Hat testified that he included rain as a possible loss based on the potential for damage from mold spores having set during the March and April rains. However he also testified that he saw no specific damage from rain during the course of the year. Arnold testified that it was "possible" that the rain washed off blooms from the bunches, but his determination as to percentage was arbitrary. Finally, Michael Sarabian testified that it was "possible" that raisining of grapes could come from the berries being infected by mildew and mold, but that in this instance the raisining he witnessed on Rampage Ranch was caused by drying from excessive heat.

The court acknowledges that a certain amount of speculation is part and parcel of crop insurance adjusting. However, the

court has nothing but speculation as to rain damage here. All of the evidence points to heat damage as the sole cause of the crop loss. That being said, no party to this dispute has contested the existence of a federal rule prohibiting a 0% loss allocation. As such, the court attributes 1% of the total loss or $7,613.29 to rain damage.

Hat has raised the same arguments regarding the *nunc pro tunc* effect of abandonment here. For the same reasons discussed above, the court finds that the balance of equities favors *nunc pro tunc* abandonment. Trustee therefore did not have an insurable interest in the crop when the alleged rain damage occurred. Based on the foregoing, the court finds that neither Hat nor Trustee as Plaintiff are entitled to that portion of the indemnity attributable to rain damage: $7,613.29.

**Heat Damage**

All parties agree that the grapes were principally damaged by excessive heat in 2003. Because of the allocation made above to rain damage and because this is the only other potential loss alleged, the court finds that 99% of the loss or $753,715.71 is attributable to heat damage.

The parties do however disagree as to the timing of the purported damage. Trustee alleges that all of the heat damage occurred during a temperature spike in the last week of June, 2003, prior to abandonment of Rampage Ranch and Coastal Vineyard. Hat asserts that the damage occurred due to extended high

temperatures during July and August 2003, after abandonment of
the vineyards and their crops.

The 2001 Multiple Peril Basic Provisions define damage as
"[i]njury, deterioration, or loss of production of the insured
crop due to insured or uninsured causes." 7 C.F.R. § 457.8, ¶ 1
(2003). The timing for such injury, deterioration, etc., is not
addressed in the Federal Regulations so the court looks to
California law to clarify the issue. Hat cites Prudential-LMI
Commercial Ins. v. Superior Court, 51 Cal.3d 674 (Cal. 1990).
While that decision is not directly on point, it is helpful.
Prudential initially interpreted the specific term "inception of
loss" in California Insurance Code Section 2071 to determine when
the one year statute of limitations therein began to run. Later
in the decision the California Supreme Court held that the
definitions of "inception of loss" and "manifestation of the
loss" are the same. Both are defined as "that point in time when
appreciable damage occurs and is or should be known to the
insured, such that a reasonable insured would be aware that his
notification duty under the policy has been triggered." Id. at
699. The court will apply that definition here where damage to
the grapes can occur over a period of days or weeks. It can
remain unnoticed until physical symptoms manifest themselves on
the grapes, e.g. in the form of raisining.

Trustee presented the expert testimony of Dr. Julian Whaley,
Ph.D. who was qualified as an expert in forensic plant pathology.
Dr. Whaley's opinion testimony was based entirely on a review of

temperature records.  Because he became involved in this dispute long after the fact, he did not personally inspect the grape crops in question during the 2003 growing season.  He has no personal knowledge of the condition of the vineyards or the crop in 2003.

The court is not persuaded by Dr. Whaley's testimony.  Not only did he lack personal knowledge of the 2003 crop, his expert report included the use of erroneous temperature records.  He incorrectly used temperature information for Arroyo Seco, Monterey County, California for Rampage Ranch, which is actually located near Fresno, California.  The court takes judicial notice pursuant to Federal Rule of Evidence 201 that Arroyo Seco, Monterey County is approximately 100 miles to the west-southwest of Fresno.  Dr. Whaley did testify that using additional temperature data provided by one of Hat's witnesses, his opinion as to the timing of damage would not change.

Hat provided testimony from himself, Pistoresi, and Michael Sarabian.  Mr. Sarabian's testimony is helpful on the issue of heat damage versus rain damage, but he further testified that he could not state when the damage occurred.  Pistoresi testified as a percipient witness that he visited Rampage Ranch on a weekly basis.  In addition, his employees were farming the property regularly.  Neither Hat nor Pistoresi noticed any damage to the crop in June, 2003.  Pistoresi testified that an employee of had noticed sunburn in late July, 2003 and informed Pistoresi of it at that time.  After the second such report within a week,

Pistoresi examined Rampage Ranch himself in early August, 2003. He noticed sunburning of the grapes and thereafter informed Hat of the potential damage to the grapes. In response, Notice of Loss forms indicating "probable loss" under the Subject Policies were prepared. Hat signed each such Notice of Loss on or about August 20, 2003.

The court is persuaded by Hat's evidence. Applying the manifestation test announced in Prudential, *supra.*, to that evidence shows that the damage occurred at some point in mid to late July, 2003. The court therefore finds that the loss occurred after abandonment of the subject properties. Thus, because the vineyards and their crops reverted *nunc pro tunc* after abandonment and because the heat damage occurred after abandonment, Trustee did not have an insurable interest in the crop at the time of loss due to heat. While Hat may have had an insurable interest at that time, he cannot recover because he is not the Insured. Based on the foregoing, the court finds that neither Hat nor Trustee as Plaintiff are entitled to that portion of the indemnity attributable to heat damage: $753,715.71.

**Return of Interpled funds to Interpleading Plaintiff**

Since the court has determined that neither Hat nor Trustee as counter-defendants are entitled to any portion of the indemnity, it is left to determine whether or not those funds may be returned to the interpleading plaintiff. The court finds that is the appropriate remedy.

Surprisingly, Hat has failed to address this issue anywhere in his post-trial briefing. The court notes that on more than one prior occasion, Hat has argued that return of the funds to GAIC would be inappropriate citing Nationwide Mut. Fire Ins. Co. v. Eason, 736 F.2d 130 (4th Cir. 1984). This out-of-circuit decision is not binding on this court. Furthermore the facts described therein are significantly different from the facts of this case such that Eason is clearly distinguishable. In Eason, the insurance company interpled the fund but none of the defendants answered. Instead, they filed claims in the parent bankruptcy case. The bankruptcy trustee was permitted to intervene in the interpleader and obtain the fund. In addition, it was undisputed that the defendants who filed claims in the bankruptcy case were entitled to some or all of the fund. Here we have two counter-defendants who have answered the Counterclaim. We also have a determination that neither of the counter-defendants is entitled to the monies.

The court will follow the rule established by the Seventh Circuit Court of Appeals in Reliance Nat'l Ins. Co. v. Great Lakes Aviation, Ltd., 430 F.3d 412 (7th Cir. 2005).

> [W]e consider finally who gets the $1 million if the passengers fail to establish the owners' liability. Great Lakes and Raytheon have no claim to it. Their only possible claim would be one based on a right of contribution, and the statute bars that. Logically the money should go back to Reliance if the passengers fail to establish the owners' liability to them, because in that event no one will have a superior claim to Reliance's claim. The money is, after all, Reliance's, which it deposited in court solely in order to avoid being dragged into the disputes between its insureds and their tort claimants. It is no longer the law that

> the interpleader plaintiff (Reliance) must have no stake in the proceeding. Indianapolis Colts v. Mayor & City Council of Baltimore, 733 F.2d 484, 486 (7th Cir.1984); Ashton v. Josephine Bay Paul & C. Michael Paul Foundation, Inc., 918 F.2d 1065, 1069 (2d Cir.1990); 4 Moore's Federal Practice § 22.02 [2] (3d ed. 2005).

Reliance, 430 F.3d at 417. Applying this theory to the facts of this case, the court orders $761,329.00 returned to the interpleading plaintiff, who after his settlement with GAIC is Trustee.

**Affirmative Defenses to Counterclaim**

Both Hat and Trustee pled various affirmative defenses in their answers to the counterclaim. Certain affirmative defenses were deemed abandoned and have been addressed by the court's pre-trial order. The court will only address those that remain.

**Trustee**

The three affirmative defenses pled by Trustee in his answer to the counterclaim that remain pursuant to the court's pre-trial order are waived by Trustee in his post-trial brief.

**Hat**

In his answer to the counterclaim (Dkt. No. 47), Hat pled seven affirmative defenses. The pre-trial order deemed the first and second affirmative defenses to be abandoned. The fourth affirmative defense was deemed waived pursuant to the terms of the court's Scheduling Order. The sixth and seventh affirmative

defenses are not mentioned in the pre-trial order and are therefore waived. 3 Lawrence P. King et al., MOORE'S FEDERAL PRACTICE, § 16.78[3] (Matthew Bender 3d ed. March, 2006); 999 v. C.I.T. Corp., 776 F.2d 866, 870 n. 2 (9th Cir. 1985); and First Card v. Hunt (In re Hunt), 238 F.3d 1098, 1101-2 (9th Cir. 2001). Two of Hat's affirmative defenses remained following the pre-trial order. The court will address them in order.

A. Estoppel. The court finds that Hat has failed to satisfy the requirements for equitable estoppel. The elements of estoppel are:

"(1) the party to be estopped must be apprised of the true facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury."

Cedars-Sinai Medical Center v. Shewry, 137 Cal.App.4th 964, 987, 41 Cal.Rptr.3d 48 (2006)(citations omitted). All elements must be present for application of this equitable doctrine. Hat has failed to satisfy his burden of proving the first part of the test. He has failed to show that GAIC knew of the true state of facts regarding who its insured was. Without knowledge of that seminal point, GAIC's could not know which counter-defendant, if any, was entitled to the indemnity under the Subject Policies.

B. Waiver. The court finds that Hat has failed to satisfy the requirements for waiver.

> Waiver is the intentional relinquishment of a known right after knowledge of the facts. [Citations.] The burden ··· is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and "doubtful cases will be decided against a waiver [citation]. The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right. Waiver always rests upon intent.

Kacha v. Allstate Ins. Co., 140 Cal.App.4th 1023, 1033-34, 45 Cal.Rptr.3d 92, 99 (Cal.Ct.App. Sept. 20, 2006). There is no clear and convincing evidence of either an express or implied waiver. There is in fact no evidence of an intention by GAIC to relinquish its right to recover the indemnity should neither Trustee nor Hat be entitled to it. The filing of the interpleader itself is not itself evidence of intent. It is clear that GAIC did not become aware of the possibility that its belief as to who the insured was under the Subject Policies was erroneous until after the interpleader was filed. It therefore did not have adequate knowledge of the facts for the court to impose a waiver. There can therefore be no waiver.

**Costs of Suit**

Trustee's requests for costs of suit is denied. Trustee is a prevailing party in only the most limited sense of that term. He only prevailed in obtaining a finding that the Subject Policies were property of the estate. But for his settlement with GAIC, trustee would see nothing of the interpled funds.

## Conclusion

Based on the foregoing, the court finds the following:

1) Trustee is entitled to judgment in part. Trustee is entitled to judgment on his request for declaratory relief that the Subject Policies are property of the bankruptcy estate. Except as so stated, Trustee shall take nothing more by his complaint.

2) Hat shall take nothing as counter-defendant.

3) Trustee shall take nothing as counter-defendant.

4) Trustee is entitled to judgment as interpleading plaintiff. Trustee shall receive $761,329.00. Trustee shall distribute this portion of the award in accordance with his settlement with GAIC.

5) Each party shall bear their own fees and costs.

Dated: JAN 31 2007

Thomas C. Holman
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

CERTIFICATE OF MAILING

The undersigned deputy clerk in the office of the United States Bankruptcy Court for the Eastern District of California hereby certifies that a copy of the document to which this certificate is attached was mailed today to the following entities listed at the address shown on the attached list or shown below.

M. Sanders
9122 Montgomery Rd #201
Cincinnati, OH 45242

Merle Meyers
44 Montgomery St #2900
San Francisco, CA 94104

Office of the U.S. Trustee
501 I Street, Room 7-500
Sacramento, CA 95814

Victoria Baker
1830 15th St
Sacramento, CA 95814

Great American Insurance Company
Attn: Carl Linder, President
580 Walnut Street #825
Cincinnati, OH 45202

Michael Hat
9701 Sedan Ave
Manteca, CA 95337

Great American Insurance
Attn: Jere Keprios,
Registered Agent
c/o The CIT Corporation Sys
818 W 7th Street
Los Angeles, CA 90017

John Van Curen
4539 N Brawley Ave #105
Fresno, CA 93722

DATED: 2/1/07

By: [signature]
Deputy Clerk

EDC 3-070 (New 4/21/00)